IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division



<table>
<tr><td>

UNITED STATES OF AMERICA

   v.

MOHSEN FAGHIHI,

SAHEBALI MOULAEI,
 a/k/a "Ali,"

ARNOLD KAUNANG,

ALFRETS KAUNANG,

   *Defendants*.
</td></tr>
</table>

Case No.  1:20-CR-204

Count 1:  50 U.S.C. § 1705
      (Conspiracy to Violate IEEPA)

Counts 2–10: 50 U.S.C. § 1705
      (Violations of IEEPA)

Counts 11–19: 18 U.S.C. § 554
      (Smuggling Goods from the
      United States)

## INDICTMENT

August 2020 Term - At Alexandria

THE GRAND JURY CHARGES THAT:

### General Allegations

**A. The Foreign Companies**

  1.  Iran Aircraft Manufacturing Industries Company is an Iranian aircraft production company owned and controlled by the government of Iran. Among other items, Iran Aircraft Manufacturing Industries Company produces unmanned aerial vehicles ("UAVs") with military capabilities for the Iranian Revolutionary Guard Corps ("IRGC").

  2.  HRM Enterprise SDN BHD is a business in Kuala Lumpur, Malaysia, controlled by defendant SAHEBALI MOULAEI.

  3.  PT. Alstevia Dirga Deraya is an import/export business based in Indonesia, controlled by defendants ARNOLD KAUNANG and ALFRETS KAUNANG.

4.      Sepehr Ghoghnoos Kish Company is an import/export business based in Tehran, Iran, controlled by defendant SAHEBALI MOULAEI.

**B.      The American Companies**

5.      Bell Textron is a manufacturer of aircraft parts, based in Fort Worth, Texas.

6.      U.S. Company A is an air charter company and a vendor of aircraft supplies and services, based in Lubbock, Texas.

7.      U.S. Company B is an aircraft supply distributor, based in Frederick, Maryland.

8.      U.S. Company C-Singapore is a regional sales office of U.S. Company C, an aerospace manufacturer, headquartered in Phoenix, Arizona.

9.      U.S. Company D is an aerospace parts distributor, based in Miami, Florida.  Since October 2018, it has been a subsidiary of a U.S. aerospace company headquartered in Chicago, Illinois.

10.     U.S. Company E is a supplier of aircraft parts, based in Apple Creek, Ohio.

11.     U.S. Company F is a supplier of aviation parts and services, based in Peachtree City, Georgia.

12.     U.S. Company G is a manufacturer of aircraft parts, based in Fredericksburg, Virginia.

**C.      The International Emergency Economic Powers Act and the Iranian Transactions and Sanctions Regulations**

13.     The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–1706, authorized the President of the United States ("the President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declares a national emergency with respect to that threat.  Pursuant to this authority, the President and the

2

executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or U.S.-origin goods.

14.     On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat." Executive Order No. 12957, as expanded and continued by Executive Orders Nos. 12959 and 13059 (collectively, "Executive Orders"), was in effect at all times relevant to this Indictment.

15.     The Executive Orders imposed economic sanctions, including a trade embargo, on Iran.     The Executive Orders prohibited, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  The Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

16.     The Executive Orders authorized the United States Secretary of the Treasury, in consultation with the United States Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Executive Orders.  Pursuant to this authority, the Secretary of the Treasury, promulgated the Iranian Transactions and Sanctions Regulations ("ITSR"), implementing the sanctions imposed by the Executive Orders.

17.     The ITSR generally prohibit any person from exporting or causing to be exported from the U.S. to Iran any goods or technology without having first obtained an export license

3

from the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"). The

ITSR imposed, among others, the following prohibitions:

   a.   *Section 560.203 – Evasions; attempts; causing violations; conspiracies.*

   (a) Any transaction on or after the effective date that evades or avoids,
            has the purpose of evading or avoiding, causes a violation of, or
            attempts to violate any of the prohibitions set forth in this part is
            prohibited.

   (b) Any conspiracy formed to violate any of the prohibitions set forth in
            this part is prohibited.

   b.   *Section 560.204 – Prohibited exportation, reexportation, sale, or supply of goods,
        technology, or services to Iran.*

        Except as otherwise authorized [by a license issued by OFAC], the exportation,
        reexportation, sale, or supply, directly or indirectly, from the United States, or by
        a United States person, wherever located, of any goods, technology, or services to
        Iran or the Government of Iran is prohibited, including the exportation,
        reexportation, sale, or supply of any goods, technology, or services to a person in
        a third country undertaken with knowledge or reason to know that:

   (a) Such goods, technology, or services are intended specifically for
            supply, transshipment, or re-exportation, directly or indirectly, to Iran
            or the Government of Iran...

   c.   *Section 560.205 – Prohibited reexportation of goods, technology, or services to
        Iran or the Government of Iran by persons other than United States persons;
        exceptions.*

        Except as otherwise authorized pursuant to this part... the reexportation from a
        third country, directly or indirectly, by a person other than a United States person,
        of any goods, technology, or services that have been exported from the United
        States is prohibited, if:

        (1) Undertaken with knowledge or reason to know that the reexportation is
            intended specifically for Iran or the Government of Iran; and

        (2) The exportation of such goods, technology, or services from the United States
            to Iran was subject to export license application requirements under any
            United States regulations in effect on May 6, 1995, or thereafter is made
            subject to such requirements imposed independently of this part.

18. The ITSR were in effect at all times relevant to this Indictment.

4

19.     On the grounds that Iran Aircraft Manufacturing Industries Company was owned by the Government of Iran and supported the IRGC, OFAC designated Iran Aircraft Manufacturing Industries Company in 2008 as an entity with which no U.S. person may engage in financial transactions, without a license issued by OFAC.

20.     Sales documents for aircraft parts manufactured in the United States often include export compliance information stating the part(s) and/or technology are subject to the Export Administration Regulations ("EAR") and that such parts and/or technology purchased shall not be shipped or transshipped to any country currently under an embargo by a U.S. government agency, including Iran, or transferred to any individual or entity identified on an U.S. government restricted party list.

21.     Due to sanctions against Iran, Iranian businesses involved in attempts to procure aircraft parts manufactured in the U.S. try to hide their involvement in such procurements by using third parties and third countries to receive and transship such aircraft parts.

22.     Shipping documents regularly contain the acronym "FOB," which means "free on board" and refers to when and where ownership of the good transfers to the buyer.

5

### D.    The Defendants

23.    Defendant MOHSEN FAGHIHI is a 54-year-old citizen of Iran, residing in Tehran, Iran. FAGHIHI is employed as a procurement agent for Iran Aircraft Manufacturing Industries Company. The following photograph depicts MOHSEN FAGHIHI:



24.    Defendant SAHEBALI MOULAEI, also known as "Ali Moulaei" and "Ali Moulaei," is a 56-year-old citizen of Iran, residing in Tehran, Iran. SAHEBALI MOULAEI registered the business HRM Enterprise SDN BDH in Kuala Lumpur, Malaysia, as a wholesaler, distributor, and agent for information technology products, spare parts, and electrical products and equipment. MOULAEI also is employed as a Managing Director of Sepehr Ghoghnoos Kish Company, an Iranian company. The following photograph depicts SAHEBALI MOULAEI:



25.     Defendant ARNOLD KAUNANG is a 26-year-old citizen of Indonesia, residing in West Java, Indonesia.  ARNOLD KAUNANG is employed by the Indonesian company, PT. Alstevia Dirga Deraya. The following photograph depicts ARNOLD KAUNANG:



26.     Defendant ALFRETS KAUNANG is a 55-year-old citizen of Indonesia, residing in West Java, Indonesia, and the father of ARNOLD KAUNANG.  Like his son, ALFRETS KAUNANG is employed by the Indonesian company, PT. Alstevia Dirga Deraya.    The following photograph depicts ALFRETS KAUNANG:



27.     ARNOLD KAUNANG, ALFRETS KAUNANG, MOHSEN FAGHIHI, and SAHEBALI MOULAEI never applied for, obtained, or possessed a license or authorization from OFAC to export goods, technology, or services of any description to Iran.

7

<u>COUNT 1</u>

(*Conspiracy to Violate the International Emergency Economic Powers Act*)

1.      The Grand Jury realleges and incorporates by reference the General Allegations listed in this Indictment.

2.      From in or about August 2015, and continuing to in or about the present date, in an offense begun outside of the jurisdiction of any particular state or district of the United States, and committed in the City of Fredericksburg in the Eastern District of Virginia and elsewhere, the defendants, SAHEBALI MOULAEI, MOHSEN FAGHIHI, ARNOLD KAUNANG, and ALFRETS KAUNANG, who will be first brought to the Eastern District of Virginia, knowingly and unlawfully conspired with each other and with other conspirators, known and unknown to the Grand Jury, to violate regulations and prohibitions issued under IEEPA, in that defendants conspired to export U.S. goods to Iran without having first obtained the required authorizations from the United States Department of the Treasury Office of Foreign Assets Control.

<u>Ways, Manner and Means</u>

The main purpose of the conspiracy was to enable the defendants to evade United States sanctions against Iran, in order to supply Iran with aircraft parts manufactured in the United States.   The manner and means by which the defendants and their conspirators sought to accomplish the objects of the conspiracy included, among others, the following:

1.      It was part of the conspiracy that, in order to evade United States sanctions against Iran, the defendants used third countries and front companies to conceal from the vendors of the U.S. parts the true end user of their purchases.

8

2.     It was part of the conspiracy that FAGHIHI, on behalf of Iran Aircraft Manufacturing Industries Company, asked MOULAEI to obtain U.S.-origin aircraft parts and other goods.

3.     It was part of the conspiracy that MOULAEI used HRM Enterprise SDN BHD, in Kuala Lumpur, Malaysia, to purchase aircraft parts and equipment from co-conspirators ARNOLD KAUNANG and ALFRETS KAUNANG and others, in order to conceal that the items ultimately were destined for Iran.

4.     It was part of the conspiracy that, to conceal the fact that the aircraft parts and other goods were intended for transshipment to FAGHIHI in Iran, MOULAEI sought to purchase U.S.-origin aircraft parts and other goods from PT. Alstevia Dirga Deraya, a company controlled by ARNOLD KAUNANG and ALFRETS KAUNANG in Indonesia.

5.     It was part of the conspiracy that ARNOLD KAUNANG and ALFRETS KAUNANG placed orders with U.S. companies for aircraft parts and other goods that MOULAEI could not have directly purchased from American companies without the permission of the U.S. government.

6.     It was part of the conspiracy that, upon receipt of the aircraft parts and other goods from U.S. companies, ARNOLD KAUNANG and ALFRETS KAUNANG would then transship the items to MOULAEI, for ultimate delivery to FAGHIHI in Iran.

7.     It was part of the conspiracy that MOULAEI would receive the aircraft parts from ARNOLD KAUNANG and ALFRETS KAUNANG and then transship them to FAGHIHI in Iran.

8.      It was part of the conspiracy that MOULAEI would receive payment from Iran Aircraft Manufacturing Industries Company, and then pay ARNOLD KAUNANG and ALFRETS KAUNANG.

9.      It was part of the conspiracy that the defendants communicated about the conspiracy via email and at in-person meetings.  Over email, the defendants solicited quotes for aircraft parts from each other and U.S. companies, shared price quotes with one another, placed orders for parts, updated one another on logistics and payment details, and worked to conceal the actual end user of the aircraft parts in order to evade United States sanctions against Iran in violation of IEEPA.

10.     It was part of the conspiracy that the defendants intentionally concealed the ultimate end use and end users of U.S.-origin aircraft parts and other goods from manufacturers, distributors, shippers, and freight forwarders located in the U.S. and elsewhere, as well as from U.S. Customs and Border Protection.

11.     It was part of the conspiracy that the defendants never obtained the appropriate licenses from OFAC for the export of the aircraft parts and other goods from U.S. companies.

Overt Acts

In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, the defendants and their conspirators committed overt acts including but not limited to the following:

1.      On or about August 24, 2015, ALFRETS KAUNANG emailed MOULAEI, explaining that the main bank account of PT. Alstevia Dirga Deraya had been temporarily blocked due to a payment the company had received from Iran.  ALFRETS KAUNANG wrote, "This has been brought about because our company's Account can NOT reflect any payments at the moment as we received a payment from IRAN and due to the sanction on IRAN we can not

be able to use our Main company Account for payment." In the email, ALFRETS KAUNANG instructed MOULAEI to use the company's offshore operating account for an expected payment, explaining that the offshore account "is always been used for funds transfer anytime cases like this occur."

2.      On or about August 25, 2015, in the course of an email asking ALFRETS KAUNANG for details of an offshore account, MOULAEI wrote, "We never send you any money from Iran, we send money to you from another country."

3.      On or about July 18, 2016, FAGHIHI emailed Iran Aircraft Manufacturing Industries Company the contact and bank account information for HRM Enterprise SDN BHD, registered to MOULAEI, describing it as "our company details in Malaysia."

4.      On or about July 31, 2016, FAGHIHI received from Iran Aircraft Manufacturing Industries Company a contract to purchase $45,235.60 worth of aviation supplies of U.S. origin for helicopters and planes from HRM Enterprise SDN BHD.

5.      On or about August 1, 2016, FAGHIHI emailed MOULAEI the contract for Iran Aircraft Manufacturing Industries Company to purchase $45,235.60 worth of aviation supplies of U.S. origin from HRM Enterprise SDN BHD.

6.      On or about August 1, 2016, MOULAEI returned to FAGHIHI by email a signed contract for Iran Aircraft Manufacturing Industries Company to purchase $45,235.60 worth of aviation supplies of U.S. origin from HRM Enterprise SDN BHD. The contract reflected a HRM Enterprise SDN BHD stamp and signature of the General Director.

7.      On or about August 1, 2016, FAGHIHI emailed Iran Aircraft Manufacturing Industries Company the signed contract for the purchase of $45,235.60 worth of aviation supplies of U.S. origin from HRM Enterprise SDN BHD.

8.      On or about February 15, 2017, MOULAEI emailed to a broker of aircraft parts screenshots from "treasury.gov" titled "NONPROLIFERATION: WHAT YOU NEED TO KNOW ABOUT TREASURY RESTRICTIONS", summarizing certain sanctions applicable to exports to Iran in general and Iran Aircraft Manufacturing Industries Company in specific.

9.      On or about August 4, 2017, in an email to a helicopter broker in China about a potential purchase of helicopters for delivery to Iran, MOULAEI asked if the broker could change registry documents for Iran.

10.     On or about August 4, 2017, MOULAEI received a response from the broker in China, in which the broker stated, in part:

> Based on the current international environment, it is very difficult to make this deal happen. The destination country is under UN, EU and US sanction. Everyone involved is facing severe punishment. The Bell 412 helicopter also very sensitive due to its capability. It can be used both for civilian and military. Due to this kind helicopter is under strict control under US State Department, US Department of Treasury and OFAC etc. each deal related to this helicopter will go through a detailed investigation.

11.     On or about August 4, 2017, MOULAEI responded to the broker in China with a proposal to circumvent the sanctions on the sale of helicopters to Iran:

> I know all these points. I am professional, but I suggested two procedure. In both you and me will benefit and almost the same risk.
>     -you and me sign contract.
>     -you buy helicopters in the name of your company.
>     -after seeing the your contract, I will pay down payment.
>     -you bring helicopters to china and do registration.
>     -lease me with a formal contract and send helicopters to kish with permission China.
> (don't need ofac)
>     -you arrange registration documents and take remain money contract
> This is a safe procedure.

12.     On or about August 16, 2017, MOULAEI emailed the broker in China again, this time seeking an electronic system for a piloting turret that includes "night vision, camera, laser,

range finder, thermal imaging, television channel and multi function LCD with target detection range 10 km." He also said he needed "UAV (Unmanned aerial vehicle) or A.P.V. (Remote piloted aerial vehicle)."

13.     On or about September 5, 2017, MOULAEI received a response from the broker in China, in which the broker noted that "currently there is sanction from USA, banking is not allowed to support companies in your country. please let us know how you will solve this issue."

14.     On or about September 6, 2017, MOULAEI responded via email to the broker in China, and explained a "different safe way" to make payments:

> -Use a third party in contract.
> -Use a private company in your country and a private company here.
> -Contract as a contract for the transfer of technology.

15.     On or about September 16, 2017, MOULAEI forwarded to FAGHIHI the email exchange with the broker in China about the UAV order, and asked FAGHIHI to provide information relating to the price, delivery, and availability of additional items, including night vision equipment and a turbofan engine.

## A.     Iran Aircraft Manufacturing Industries Company Order 8409490

16.     On or about January 30, 2018, MOULAEI emailed PT. Alstevia Dirga Deraya a Request For Quote ("RFQ") identified as "8409490," for 200 types of aircraft parts, including 15 that ultimately were ordered from U.S. companies.

17.     On or about January 31, 2018, ALFRETS KAUNANG responded to MOULAEI with price quotes for approximately 130 of the 200 aircraft parts from RFQ 8409490. The document noted "FOB Indonesia," indicating the buyer of the item was in Indonesia.

18.     On or about February 3, 2018, MOULAEI emailed FAGHIHI with the subject "200 items" and explained that "the prices of the 200 requested items are presented below and

they can be utilized anyway you wish." Attached was a list of the 200 aircraft parts from RFQ 8409490 with quotes for 130 parts. The document noted "FOB is Tehran."

19.     On or about February 4, 2018, ALFRETS KAUNANG emailed MOULAEI an updated RFQ 8409490 that included price quotes for approximately 35 additional aircraft parts that were not quoted on January 31, 2018 (as described in Overt Act 17).

20.     On or about February 7, 2018, MOULAEI emailed FAGHIHI the list of prices related to RFQ 8409490 that ALFRETS KAUNANG sent MOULAEI on February 4, 2018 (as described in Overt Act 19).

21.     On or about March 14, 2018, FAGHIHI emailed Iran Aircraft Manufacturing Industries Company a signed invoice for 50 of the 200 aircraft parts from RFQ 8409490. The invoice was on HRM Enterprise SDN BHD letterhead, listed the seller as HRM Enterprise SDN BHD, and the buyer as Iran Aircraft Manufacturing Industries Company, with the final delivery place of Tehran, Iran. The total price of the 50 parts was listed as $125,934.40.

22.     On or about March 15, 2018, MOULAEI emailed PT. Alstevia Dirga Deraya an invoice for what he labeled as purchase order 8409490, which consisted of the same 50 aircraft parts from the invoice that FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 14, 2018 (as described in Overt Act 21). The invoice was on HRM Enterprise SDN BHD letterhead and was directed to ALFRETS KAUNANG, with the place of delivery as Tehran, Iran.

23.     On or about March 17, 2018, FAGHIHI emailed Iran Aircraft Manufacturing Industries Company an updated invoice for purchase order 8409490. The invoice was on HRM Enterprise SDN BHD letterhead and included two additional parts from RFQ 8409490 that were

14

not included in the March 14, 2018, invoice (as described in Overt Act 21). The updated invoice for 52 aircraft parts listed the total price as $125,581.

24.     On or about March 18, 2018, MOULAEI emailed ALFRETS KAUNANG an updated invoice, on HRM Enterprise SDN BHD letterhead, listing the same 52 aircraft parts that were included in the invoice that FAGHIHI sent to Iran Aircraft Manufacturing Industries Company the previous day (as described in Overt Act 23). The total price listed on the invoice was $90,839.30.

25.     On or about March 22, 2018, ARNOLD KAUNANG emailed U.S. Company F, an aviation parts supplier in Peachtree City, Georgia, a RFQ for the same 50 parts that appeared in the invoice that FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 14, 2018 (as described in Overt Act 21). The next day, ARNOLD KAUNANG received from U.S. Company F price quotes for 17 of those 50 aircraft parts.

26.     On or about March 22, 2018, after submitting a RFQ for aircraft parts to U.S. Company E, a supplier of aircraft parts, based in Apple Creek, Ohio, PT. Alstevia Dirga Deraya received from U.S. Company E a response to its RFQ with price quotes for 29 different aircraft parts, all of which appeared in the invoice that FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23).

27.     On or about March 23, 2018, ALFRETS KAUNANG submitted a RFQ to U.S. Company C-Singapore for 50 units of a micro switch.  The same micro switch appeared in the invoice FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23).  The following photograph depicts a micro switch from U.S. Company C, which has applications for commercial and military aircraft and military systems:



28.     On or about March 23, 2018, ARNOLD KAUNANG responded by email to a question by an account manager at U.S. Company C-Singapore, about the application of the micro switch (as described in Overt Act 27), to explain that, "The application is for Bell Helicopter."

29.     On or about March 23, 2018, ALFRETS KAUNANG received from U.S. Company C-Singapore a price quote for 50 units of the micro switch (as described in Overt Act 27), listing a unit price of $530.16, for a total of $26,508.

30.     On or about March 27, 2018, ARNOLD KAUNANG submitted a RFQ for a metal ring to U.S. Company A in Lubbock, Texas.  That same day, ARNOLD KAUNANG received a quote from U.S. Company A for metal rings. The same metal rings appeared in the invoice FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23).

16

31.     On March 27, 2018, after submitting an RFQ to U.S. Company G, PT. Alstevia Dirga Deraya received from U.S. Company G a price quote for a T-fitting that also appeared in the invoice FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23).

32.     On or about March 28, 2018, ARNOLD KAUNANG emailed U.S. Company C-Singapore a purchase order, dated March 26, 2018, for 50 units of the micro switch (as described in Overt Act 27), for a total price of $26,508.

33.     On or about March 30, 2018, ALFRETS KAUNANG placed an order with U.S. Company D, based in Miami, Florida, for six aircraft parts, consisting of two types of nuts, a pin, and three types of washers that were listed in the invoice FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23). .

34.     On or about March 31, 2018, ARNOLD KAUNANG emailed U.S. Company F a signed purchase order for five aircraft parts U.S. Company F could provide from the RFQ that ARNOLD KAUNANG sent U.S. Company F on March 22, 2018 (as described in Overt Act 25). The five aircraft parts included bearings, bolts, and nuts.

35.     On or about April 2, 2018, ARNOLD KAUNANG emailed U.S. Company F an executed export compliance certificate, signed in his capacity as President Director of PT. Alstevia Dirga Deraya, asserting that the aircraft parts received from U.S. Company F that were ordered on March 31, 2018 (as described in Overt Acts 25 and 34), would not be shipped or transshipped to any country currently under an embargo by a U.S. government agency, to include Iran.

36.     On or about April 2, 2018, after receiving price quotes for 29 aircraft parts from U.S. Company E on March 22, 2018 (as described in Overt Act 26), ARNOLD KAUNANG

17

emailed U.S. Company E a purchase order for four aircraft parts, including grommets, various nuts, and T-fittings.

37.     On or about April 3, 2018, PT. Alstevia Dirga Deraya received an invoice and a sales order acknowledgement from U.S. Company C-Singapore for 50 units of the micro switch (as described in Overt Acts 27 and 32), for a total price of $26,508, both of which listed the buyer as ARNOLD KAUNANG, the destination as Indonesia, and the country of origin of the parts as "USA."

38.     On or about April 4, 2018, PT. Alstevia Dirga Deraya received an invoice from U.S. Company D, for the order of six aircraft parts placed by ALFRETS KAUNANG on March 30, 2018 (as described in Overt Acts 23 and 33).  The invoice noted which parts of the order were classified under the Export Administration Regulations and explicitly stated that:

> These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified.  They may not be resold, transferred, or otherwise disposed of to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other times, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.

39.     On or about April 5, 2018, PT. Alstevia Dirga Deraya received an email from U.S. Company F with the invoice for the five aircraft parts ordered by ARNOLD KAUNANG on March 31, 2018 (Overt Acts 25 and 34), reflecting that the order was shipped that day.

40.     On or about April 5, 2018, ARNOLD KAUNANG emailed U.S. Company A a purchase order for metal rings, which appeared in the invoice FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23), and a completed credit card authorization form that listed the cardholder's name as ALFRETS KAUNANG.

41.     On or about April 6, 2018, ARNOLD KAUNANG ordered from U.S. Company G, in Fredericksburg, Virginia, 47 units of a T-fitting, as found in the invoice FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23), and enclosed an end-user/end-use certificate executed on April 5, 2018, by ALFRETS KAUNANG, in his capacity as Director of PT. Alstevia Dirga Deraya.  In signing the certificate, ALFRETS KAUNANG certified that the equipment received from U.S. Company G would be received by PT. Alstevia Dirga Deraya for end use by an Indonesian company, and that it would not be transferred, transshipped, or otherwise disposed of in any other country than Indonesia, in either original form or otherwise, without first obtaining necessary authorization from the U.S. government.

42.     On or about April 9, 2018, PT. Alstevia Dirga Deraya received from U.S. Company G an invoice for the order of T-fittings placed on April 6, 2018 (as described in Overt Act 41), and an air waybill confirmation that U.S. Company G had shipped the T-fittings to PT. Alstevia Dirga Deraya in Singapore that same day.

43.     On or about April 10, 2018, PT. Alstevia Dirga Deraya received an email from U.S. Company A with an invoice for the order placed on April 5, 2018 (as described in Overt Act 40), noting that the order shipped to Singapore that same day.

44.     On or about April 11, 2018, ARNOLD KAUNANG received an email from U.S. Company D, confirming that U.S Company D had received his payment for the order of six aircraft parts placed on March 30, 2018 (as described in Overt Acts 23 and 33), and that U.S. Company D would prepare his order for shipment.

45.     On or about April 12, 2018, in order to pay for the four aircraft parts he ordered on April 2, 2018 (as described in Overt Act 36), ARNOLD KAUNANG emailed U.S. Company

E a credit card information form, using a PT. Alstevia Dirga Deraya company credit card in ALFRETS KAUNANG's name. U.S. Company E shipped the order to ARNOLD KAUNANG in Singapore the same day.

46.     On or about April 12, 2018, U.S. Company D shipped to ALFRETS KAUNANG in Singapore the six aircraft parts that ALFRETS KAUNANG ordered on March 30, 2018 (as described in Overt Acts 26 and 33).

47.     On or about April 17, 2018, ARNOLD KAUNANG emailed MOULAEI an air waybill and four invoices for aircraft parts on PT. Alstevia Dirga Deraya letterhead. One of the invoices, Invoice No. 00007, related to purchase order 8409490, reflected an order for 13 U.S.-origin aircraft parts, all of which appeared in the invoice FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23), and included parts supplied by U.S. Companies A, D, E, F, and G. Another invoice, Invoice No. 0005, was for two fire extinguishers. Invoice Nos. 00006 and 00006SH were for an unrelated purchase order. In the email, ARNOLD KAUNANG wrote that he would "ship asap by DHL" under only one of the four invoices. The cargo manifest for the shipment listed the shipper as PT. Alstevia Dirga Deraya and the consignee as Sepehr Ghoghnoos Kish Co., in Valenak, Tehran, to the attention of MOULAEI's son. Both the cargo manifest and the air waybill identified the goods in the shipment as fire extinguishers and did not contain any reference to the other parts included in the shipment.

48.     On or about April 24, 2018, ALFRETS KAUNANG provided U.S. Company C-Singapore with proof of a down payment of $5,000 for 50 units of the micro switch (as described in Overt Acts 27 and 32), with a total cost of $26,508.

20

49.    On or about April 25, 2018, FAGHIHI emailed MOULAEI an invoice for 11 aircraft parts totaling $5,041.10.  The invoice was on HRM Enterprise SDN BHD letterhead and listed the buyer as Iran Aircraft Manufacturing Industries Company in Iran.  The 11 parts listed in the invoice matched 11 of the 13 parts listed in Invoice No. 00007 that ARNOLD KAUNANG emailed MOULAEI on April 17, 2018 (as described in Overt Act 47).

50.    On or about May 14, 2018, ARNOLD KAUNANG emailed MOULAEI a revised Invoice No. 00007, reflecting 11 aircraft parts, for a total amount of $4,408.58.  The invoice was on PT. Alstevia Dirga Deraya letterhead, was directed to HRM Enterprise SDN BDH in Kuala Lumpur, Malaysia, and listed the recipient of the shipment as Sepehr Ghoghnoos Kish Co. in Tehran, Iran.  The 11 parts listed in the invoice matched the 11 parts found in the invoice sent from FAGHIHI to MOULAEI on April 25, 2018 (as described in Overt Act 49).

51.    On or about May 18, 2018, ARNOLD KAUNANG emailed MOULAEI an air waybill and an Invoice No. 000011 for 16 aircraft parts, all of which appeared in the invoice FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23).  The air waybill listed the shipper as PT. Alstevia Dirga Deraya in Indonesia, with the contact name as ARNOLD KAUNANG.  The recipient of the goods was Sepehr Ghoghnoos Kish Co. in Tehran, Iran.  The description of the contents was "spare parts."

52.    On or about May 19, 2018, MOULAEI emailed ALFRETS KAUNANG that "[g]etting money out of the customer is very difficult here. Believe me. I have not gotten the money from Bell items or previous hard ware."

53.    On or about June 27, 2018 U.S. Company C-Singapore emailed ARNOLD KAUNANG that the 50 units of the micro switch that were ordered on March 23, 2018 (as

described in Overt Acts 27 and 32) arrived at the warehouse of U.S. Company C-Singapore, and advised him to make a final payment of the remaining $21,508.

54. On or about July 3, 2018, ARNOLD KAUNANG emailed MOULAEI that ARNOLD KAUNANG needed a wire transfer of at least $30,000 in order to pay for the aircraft parts that ARNOLD KAUNANG and ALFRETS KAUNANG ordered for MOULAEI.

55. On or about July 6, 2018, ALFRETS KAUNANG emailed U.S. Company C-Singapore, to say that he would pay U.S. Company C-Singapore the final payment for the 50 micro switches (as described in Overt Acts 27 and 32) once his own company received payment from its own customer.

56. On or about September 19, 2018, ARNOLD KAUNANG emailed U.S. Company C-Singapore with proof of final payment of $21,508 for 50 units of the micro switch (as described in Overt Acts 27 and 32).

57. On or about September 20, 2018, PT. Alstevia Dirga Deraya received from U.S. Company C-Singapore an export guide that explained the documents that ALFRETS KAUNANG would need in order to pick up and carry out of Singapore the 50 units of the micro switch (as described in Overt Acts 27 and 32).

58. On or about September 23, 2018, ALFRETS KAUNANG emailed U.S. Company C-Singapore to advise the company that it should have the order of 50 micro switches (as described in Overt Acts 27 and 32) ready for him to pick up because he would arrive at the warehouse of U.S. Company C-Singapore "in 20 minutes."

59. On or about November 17, 2018, MOULAEI emailed FAGHIHI an invoice for the 50 micro switches (as described in Overt Acts 27 and 32), listing the unit price as $1,014 and the total price as $50,700.

60.     On or about November 22, 2018, ARNOLD KAUNANG emailed MOULAEI two invoices for U.S.-origin aircraft parts, all of which appeared in the invoice that FAGHIHI sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23), including 50 units of the micro switch (as described in Overt Acts 27 and 32). The invoices were on PT. Alstevia Dirga Deraya letterhead and were directed to HRM Enterprise SDN BHD with shipment to Iran.

61.     On or about November 24, 2018, MOULAEI sent ALFRETS KAUNANG an email asking whether the aircraft parts in the two invoices he received from ARNOLD KAUNANG (as described in Overt Acts 27, 32, and 59) had been shipped.

62.     On or about November 24, 2018, ALFRETS KAUNANG responded to MOULAEI to explain that the 50 units of the micro switch (as described in Overt Acts 27 and 32) had been shipped the previous week and the related parts had been shipped months earlier.

63.     On or about November 27, 2018, ARNOLD KAUNANG emailed MOULAEI a revised invoice for 50 units of the micro switch (as described in Overt Acts 27 and 32) that included a new freight charge.

64.     On or about December 1, 2018, FAGHIHI emailed MOULAEI purchase orders on Iran Aircraft Manufacturing Industries Company letterhead, at least one of which was for parts from purchase order 8409490. The email also included invoices on HRM Enterprise SDN BHD letterhead for parts from purchase order 8409490, including one matching Invoice No. 00007 that ARNOLD KAUNANG emailed MOULAEI on May 14, 2018 (as described in Overt Act 49).

65.     On or about December 10, 2018, FAGHIHI emailed MOULAEI the "final report" for 52 items from purchase order 8409490, as originally reflected in the invoice that FAGHIHI

sent to Iran Aircraft Manufacturing Industries Company on March 17, 2018 (as described in Overt Act 23). The report included all 52 items that were sent to Iran via multiple shipments, and indicated which items had been received, and which items remained to be shipped.

66. On or about December 12, 2018, ARNOLD KAUNANG emailed MOULAEI two documents, each labeled as a Statement of Account/Account Receivable, reflecting PT. Alstevia Dirga Deraya's business with HRM Enterprise SDN BHD, and each reflecting six invoices related to purchase order 8409490.

67. On or about December 24, 2018, MOULAEI emailed FAGHIHI the bill of lading and packaging list for a shipment related to purchase order 8409490. The air waybill listed the goods as "aircraft sparepart" with the destination of Tehran, Iran.

68. On or about January 30, 2019, ARNOLD KAUNANG sent MOULAEI an updated Statement of Account/Account Receivable of PT. Alstevia Dirga Deraya for HRM Enterprise SDN BHD. The statement, dated January 30, 2019, listed payments received from HRM Enterprise SDN BHD, made either via wire transfer or cash. The statement reflects the invoices for the micro switch order (as described in Overt Acts 27 and 32) and other aircraft parts ordered in connection with purchase order 8409490, totaling at least $40,266.

**B.    Iran Aircraft Manufacturing Industries Company Order 8409509**

69. On or about February 26, 2018, MOULAEI emailed PT. Alstevia Dirga Deraya a RFQ identified as "8409509," requesting price quotes for 24 aircraft parts.

70. On or about February 28, 2018, ALFRETS KAUNANG emailed MOULAEI price quotes for all of the 24 parts from RFQ 8409509.

71.     On or about March 3, 2018, MOULAEI emailed FAGHIHI price quotes for all of the 24 aircraft parts from RFQ 8409509.  The total price quote was $13,748.90 with delivery to Iran.

72.     On or about April 23, 2018, FAGHIHI emailed MOULAEI a purchase order for the 24 aircraft parts contained in RFQ 8409509, reflecting the same prices as those that MOULAEI sent to FAGHIHI on March 3, 2018 (Overt Act 71).  The purchase order listed the buyer as Iran Aircraft Manufacturing Industries Company and the seller as HRM Enterprise SDN BHD.

73.     On or about April 29, 2018, MOULAEI emailed PT. Alstevia Dirga Deraya an invoice for purchase order 8409509, that FAGHIHI sent to MOULAEI on April 23, 2018 (as described in Overt Act 72).  The invoice was on HRM Enterprise SDN BHD letterhead and noted that the place of delivery was Tehran, Iran.

74.     On or about January 15, 2019, ARNOLD KAUNANG received by email from U.S. Company G a price quote for two aircraft parts, specifically, a bolt and nut, from purchase order 8409509.  The email included a statement by an employee of U.S. Company G that said, "Please note a signed End User Statement will be required prior to processing any orders."

75.     On or about January 18, 2019, ARNOLD KAUNANG emailed U.S. Company G a purchase order for 25 bolts and 25 nuts, both of which appeared in purchase order 8409509 that FAGHIHI sent to MOULAEI on April 23, 2018 (as described in Overt Act 72).

76.     On or about January 18, 2019, ARNOLD KAUNANG received an email from U.S. Company G with a sales order acknowledgement for the nuts and bolts that ARNOLD KAUNANG ordered (as described in Overt Act 75).  The email included an unexecuted end-user certificate to be completed by PT. Alstevia Dirga Deraya.  The email from U.S. Company G

25

noted that, without the signed end-user agreement, it could not complete the order. The end-user certificate stated that the signer understands that the equipment was subject to the International Traffic in Arms Regulations or the Export Administration Regulations and that diversion contrary to U.S. law was prohibited.[1]

77. On or about January 18, 2019, ARNOLD KAUNANG emailed to U.S. Company G an end-user certificate signed by him, certifying the aircraft parts were for end use by PT. Alstevia Dirga Deraya in Indonesia, and were not to be transferred or transshipped to any other country.

78. On or about January 20, 2019, ARNOLD KAUNANG emailed MOULAEI to request that MOULAEI transfer $30,000 to ARNOLD KAUNANG so that ARNOLD KAUNANG could pay his supplier for the numerous parts that ARNOLD KAUNANG ordered that would be shipped to MOULAEI. ARNOLD KAUNANG listed the aircraft parts that MOULAEI had ordered from PT. Alstevia Dirga Deraya, including the nuts and bolts from purchase order 8409509 that ARNOLD KAUNANG ordered from U.S. Company G (as described in Overt Act 75).

79. On or about January 21, 2019, PT. Alstevia Dirga Deraya received a final invoice and confirmation from U.S. Company G that the January 18, 2019, order of nuts and bolts (as described in Overt Act 75) had been shipped to PT. Alstevia Dirga Deraya in Singapore on January 21, 2019.

---

[1] Although the end-user certificate stated the equipment was subject to the International Traffic in Arms Regulations or the Export Administration Regulations, it was not on the United States Munitions List and was not subject to the International Traffic in Arms Regulations. The equipment was, however, on the Commerce Control List, and subject to the Export Administration Regulations.

80.     On January 23, 2019, PT. Alstevia Dirga Deraya received a delivery notification email from UPS that stated that the shipment of "civil aircraft parts" from U.S. Company G had been delivered to PT. Alstevia Dirga Deraya in Singapore.

81.     On or about January 23, 2019, MOULAEI emailed ALFRETS KAUNANG that, in response to ARNOLD KAUNANG's email from January 20, 2019, in which ARNOLD KAUNANG requested $30,000 to pay his suppliers (as described in Overt Act 78), MOULAEI would send $20,000 to PT. Alstevia Dirga Deraya.

82.     On or about March 24, 2019, ARNOLD KAUNANG emailed MOULAEI an invoice for two types of nuts from purchase order 8409509, including the nuts from U.S. Company G that were delivered to Singapore on January 23, 2019 (as described in Overt Act 80). The invoice, dated March 5, 2019, was on PT. Alstevia Dirga Deraya letterhead and was directed to HRM Enterprise SDN BHD in Malaysia, but it noted that the actual shipment was to Iran.

**C.     Iran Aircraft Manufacturing Industries Company Order 8409900**

83.     On or about October 26, 2018, FAGHIHI received from Iran Aircraft Manufacturing Industries Company a list of 170 U.S.-manufactured aircraft parts for which it was seeking price quotes. The aircraft parts included navigational equipment, engine accessories, and electronic equipment. The email noted that delivery would be to Tehran, Iran.

84.     On or about December 26, 2018, FAGHIHI emailed MOULAEI the list of the 170 aircraft parts he had received from Iran Aircraft Manufacturing Industries Company on October 26, 2018 (as described in Overt Act 83).

85.     On or about December 27, 2018, MOULAEI sent an email to PT. Alstevia Dirga Deraya with an attachment labeled "8409900." The attachment was the same list of 170 aircraft

27

parts in the same quantity as those found in the list that MOULAEI received from FAGHIHI the previous day (as described in Overt Act 84).

86.     On or about January 5, 2019, ARNOLD KAUNANG emailed MOULAEI price quotes for some of the 170 aircraft parts (as described in Overt Act 85).

87.     On or about January 6, 2019, MOULAEI emailed ALFRETS KAUNANG, requesting an expected delivery time, the condition of the parts, and clarification about the price of specific parts from RFQ 8409900 (as described in Overt Act 85).

88.     On or about January 6, 2019, ALFRETS KAUNANG emailed MOULAEI with the condition of the aircraft parts from RFQ 8409900 (as described in Overt Act 85) that he could fulfill.

89.     On or about January 8, 2019, MOULAEI emailed FAGHIHI price quotes for 82 of the aircraft parts from RFQ 8409900 (as described in Overt Act 85).   In the message, MOULAEI noted that payment would be in U.S. dollars, and that delivery would be to Tehran in multiple phases within 60 to 90 days.

90.     On or about January 8, 2019, FAGHIHI emailed the price quotes for the 82 parts to Iran Aircraft Manufacturing Industries Company, relaying the terms that MOULAEI sent the previous day (as described in Overt Act 89).

91.     On or about January 20, 2019, MOULAEI emailed ALFRETS KAUNANG that the "customer accept our price" and again requested the conditions for each item.

92.     On or about January 20, 2019, ARNOLD KAUNANG emailed MOULAEI to explain that the conditions of the items from RFQ 8409900 (as described in Overt Act 88) were new, except as otherwise stated.

93.     On or about January 21, 2019, MOULAEI emailed FAGHIHI the same list of price quotes for the 82 parts that MOULAEI sent to FAGHIHI on January 8, 2019 (as described in Overt Act 89), with a new column that described the condition of each part. MOULAEI stated that unless otherwise noted, the parts were new.

94.     On or about January 21, 2019, FAGHIHI emailed Iran Aircraft Manufacturing Industries Company an invoice for 53 of the 82 parts from RFQ 8409900 (as described in Overt Act 89). The invoice listed the country of origin of the parts as "USA," the seller as HRM Enterprise SDN BHD, and the buyer as Iran Aircraft Manufacturing Industries Company. The parts were to be delivered to Tehran, Iran, for a total amount of $257,054.80. A few seconds later, FAGHIHI emailed the same invoice to MOULAEI.

95.     On or about February 23, 2019, FAGHIHI emailed MOULAEI a list of 33 of the 53 parts from RFQ 8409900 that FAGHIHI sent to MOULAEI on January 21, 2019 (as described in Overt Act 94), including prices for each item.

96.     On or about February 23, 2019, MOULAEI emailed to ALFRETS KAUNANG the same list of 33 parts that he received from FAGHIHI (as described in Overt Act 95), explaining that the customer wanted to pay approximately $250,000 for the 33 items. MOULAEI requested that ALFRETS KAUNANG review and confirm the quoted prices.

97.     On or about February 25, 2019, ARNOLD KAUNANG submitted an RFQ to U.S. Company B, an aircraft supply distributor based on Frederick, Maryland, for two aircrafts parts, specifically, circuit breakers and a cable clamp/back shell, both of which appeared on the list of 33 parts from RFQ 8409900 that FAGHIHI sent to MOULAEI on February 23, 2019 (as described in Overt Act 95). That same day, U.S. Company B responded with price quotes for the two parts.

98.     On or about April 14, 2019, ARNOLD KAUNANG emailed U.S. Company B an RFQ for all of the 33 parts from RFQ 8409900 that FAGHIHI sent to MOULAEI on February 23, 2019 (as described in Overt Act 95).

99.     On or about April 15, 2019, ARNOLD KAUNANG received from U.S. Company B price quotes for five of the 33 aircraft parts that ARNOLD requested on April 14, 2019 (as described in Overt Act 98), including two different types of circuit breakers, a connector, a switch light, and a switch push button.

100.    On or about April 16, 2019, PT. Alstevia Dirga Deraya received an email from the parent company of U.S. Company D, confirming the online purchase by ALFRETS KAUNANG of four of the 33 parts from RFQ 8409900 (as described in Overt Act 98). The parts included wire caps, switch buttons, wires, and connector/back shells. The email noted that the items were to be shipped on April 19, 2019, from Miami, Florida, to PT. Alstevia Dirga Deraya in Singapore, with the ultimate destination of Indonesia.

101.    On or about August 12, 2019, ARNOLD KAUNANG placed an order with U.S. Company B for four of the 33 parts on the list that ARNOLD KAUNANG sent to U.S. Company B on April 15, 2019 (as described in Overt Act 99). The parts included three types of circuit breakers and a cable clamp and all appeared in the list of 33 of the 53 parts from RFQ 8409900 that FAGHIHI sent to MOULAEI on January 21, 2019 (as described in Overt Act 94).

102.    On or about August 15, 2019, U.S. Company B shipped to Singapore the aircraft parts that were ordered on August 12, 2019 (as described in Overt Act 101), noting that the order was sold to PT. Alstevia Dirga Deraya in Indonesia. The invoice for the order contained a notice that three of the four parts were subject to the Export Administration Regulations and were

30

authorized for export only to the country of ultimate destination or end-user identified in the document and that the parts were not to be transferred or transshipped to any other country.

(All in violation of Title 50, United States Code, Section 1705).

COUNTS 2–10

(*Violations of the International Emergency Economic Powers Act*)

1.      The Grand Jury realleges and incorporates by reference the General Allegations listed in this Indictment, and the Overt Acts listed in Count 1 of this Indictment.

2.      Between on or about the dates listed below, in offenses begun outside of the jurisdiction of any particular state or district of the United States, and committed in the City of Fredericksburg in the Eastern District of Virginia and elsewhere, the defendants, SAHEBALI MOULAEI, MOHSEN FAGHIHI, ARNOLD KAUNANG, and ALFRETS KAUNANG, who will be first brought to the Eastern District of Virginia, did unlawfully, knowingly, and willfully violate a regulation issued under IEEPA,  in that the defendants did willfully and unlawfully export, reexport, sell, and supply directly or indirectly from the United States aircraft parts and other goods, and attempted to export, sell, and supply and caused to be exported, sold, or supplied aircraft parts and other goods described more fully below from the United States to Iran without having first obtained the required authorizations from the United States Department of the Treasury Office of Foreign Assets Control:

| Count | Start Date | End Date | U.S. Company | Aircraft Part & Part Number | Quantity Ordered | Overt Act |
|-------|-----------|----------|--------------|-----------------------------|------------------|-----------|
| 2 | 1/30/18 | 1/30/19 | C | Micro Switch, 622HE1-6 | 50 | 32 |
| 3 | 1/30/18 | 1/30/19 | D | Washer, AN960C8<br>Lock Nut, AN364-1032/MS21083N3<br>Nut, AN320-8<br>Pin, MS20392-3C21/AN394-21<br>Washer, AN960-816<br>Washer, AN960C416L | 100<br>1000<br>100<br>100<br>100<br>100 | 33 |
| 4 | 1/30/18 | 1/30/19 | F | Bearing, MS14101-10/03-825-10<br>Bearing, MS14104-3/MS2133-3<br>Bolt, AN3-23<br>Lock Nut, MS21083N3/AN364-1032<br>Nut, AN320-8 | 15<br>50<br>70<br>820<br>100 | 34 |

| 5 | 1/30/18 | 1/30/19 | E | Nut, AN310-10<br>Grommet, AN931-8-13<br>Nut, AN316-4<br>T-Fitting, 0715-020 | 300<br>100<br>200<br>3 | 36 |
|---|---------|---------|---|---|---|---|
| 6 | 1/30/18 | 12/10/18 | A | Ring, MS28776-22 | 5 | 40 |
| 7 | 1/30/18 | 1/30/19 | G | T-Fitting, 0715-020 | 47 | 41 |
| 8 | 2/26/18 | 3/24/19 | G | Bolt, NAS6705D20<br>Nut, MS17826-5 | 25<br>25 | 75 |
| 9 | 10/26/18 | 4/16/19 | D | End Cap, 328307<br>Switch Button, MS25089-3G<br>Wire, M22759/11-20-9<br>Back Shell, M85049-31-12N | 200<br>3<br>500<br>10 | 100 |
| 10 | 10/26/18 | 8/15/19 | B | Circuit Breaker, MS26574-10<br>Circuit Breaker, MS26574-5<br>Circuit Breaker, CDLA50<br>Back Shell, M85049-31-24N | 20<br>110<br>4<br>4 | 101 |

(In violation of Title 50, United States Code, Section 1705; Title 31, Code of Federal Regulations, Sections 560.203 and 560.204; Title 18, United States Code, Section 2).

COUNTS 11–19

*(Smuggling Goods from the United States)*

1.      The Grand Jury realleges and incorporates by reference the General Allegations listed in this Indictment, and the Overt Acts listed in Count 1 of this Indictment.

2.      On or about the dates listed below, in offenses begun outside of the jurisdiction of any particular state or district of the United States, and committed in the City of Fredericksburg in the Eastern District of Virginia and elsewhere, the defendants, SAHEBALI MOULAEI, MOHSEN FAGHIHI, ARNOLD KAUNANG, and ALFRETS KAUNANG, who will be first brought to the Eastern District of Virginia, did fraudulently and knowingly cause entities in the U.S. to export and send from the United States, and attempt to export and send from the United States, merchandise, articles, and objects contrary to laws and regulations of the United States. Specifically, as listed below, SAHEBALI MOULAEI, MOHSEN FAGHIHI, ARNOLD KAUNANG, and ALFRETS KAUNANG, caused entities in the United States to export aircraft and aircraft parts without filing Electronic Export Information or Shippers Export Declaration that accurately disclosed that the ultimate destination for the aircraft and aircraft parts was Iran (in violation of Title 13, United States Code, Section 305):

| Count | U.S. Company | Aircraft Part & Part Number | Quantity | Shipped | Overt Act |
|-------|--------------|------------------------------|----------|---------|-----------|
| 11 | C | Micro Switch, 622HE1-6 | 50 | 11/22/18 | 58 |
| 12 | D | Washer, AN960C8<br>Lock Nut, AN364-1032/MS21083N3<br>Nut, AN320-8<br>Pin, MS20392-3C21/AN394-21<br>Washer, AN960-816<br>Washer, AN960C416L | 100<br>820<br>100<br>100<br>100<br>1000 | 4/12/18 | 46 |
| 13 | F | Bearing, MS14101-10/03-825-10<br>Bearing, MS14104-3/ MS2133-3<br>Bolt, AN3-23<br>Lock Nut, MS21083N3/AN364-1032<br>Nut, AN320-8 | 15<br>50<br>70<br>820<br>100 | 4/5/18 | 39 |

| 14 | E | Nut, AN310-10<br>Grommet, AN931-8-13<br>Nut, AN316-4<br>T-Fitting, 0715-020 | 300<br>100<br>200<br>3 | 4/12/18 | 45 |
| 15 | A | Ring, MS28776-22 | 5 | 4/10/18 | 43 |
| 16 | G | T-Fitting, 0715-020 | 47 | 4/9/18 | 42 |
| 17 | G | Bolt, NAS6705D20<br>Nut, MS17826-5 | 25<br>25 | 1/21/19 | 79 |
| 18 | D | End Cap, 328307<br>Switch Button, MS25089-3G<br>Wire, M22759/11-20-9<br>Back Shell, M85049/31-12N | 200<br>3<br>500<br>10 | 4/19/19 | 100 |
| 19 | B | Circuit Breaker MS26574-10<br>Circuit Breaker, MS26574-5<br>Circuit Breaker, CDLA50<br>Back Shell, M85049-31-24N | 20<br>110<br>4<br>4 | 8/15/19 | 102 |

(All in violation of Title 18, United States Code, Sections 554 and 2).

A TRUE BILL:

Pursuant to the E-Government Act,,
The original of this page has been filed
under seal in the Clerk's Office

FOREPERSON OF THE GRAND JURY

G. Zachary Terwilliger
United States Attorney

By:

Gordon D. Kromberg
Assistant United States Attorney
Rachael C. Tucker
Special Assistant United States Attorney